God Save the United States and its Honorable Court Judge. She is a very distinguished judge and we are very privileged to have the wisdom and perspective of a United States District Court judge, especially an experienced judge such as Judge Robinson. So we really are grateful to have her here. Now on to the business of the day. In the first two cases, if counsel for all three parties in those two cases could approach the lectern, Mr. Jalowitz and Mr. Huffman, we are going to propose, unless there is a strong objection from any of the counsel, to arrange the arguments a little differently. The proposal would be to have Mr. Jalowitz go first, then Mr. Huffman, and then the government, Mr. Austin, and then rebuttal from Mr. Jalowitz and rebuttal from Mr. Huffman. No one would be depract of any time, but this would have the effect of avoiding the risk of repetition in argument or having the government responding in one case to arguments that may not have been made or may be made by one of the other opponents. I think it would keep things easier for us at least. If there is no objection, shall we proceed in that manner? That sounds like a good way of proceeding. Very well, then we'll do that. We will save, each of you has saved three minutes for rebuttal and we'll keep an eye on that. That will be okay with timekeeping. It imposes probably more of a burden on the timekeeper than on anyone else, but I think Mr. Neal is very much up to the task, I think that'll work fine. Very well, then we'll hear argument first, then from Mr. Jalowitz, followed by Mr. Huffman in First Heights Bank, and Mr. Jalowitz, Syntex against the United States. Thank you, Your Honor, and may it please the Court. There are two issues for decision, the first being, which standard to apply to this appeal and this set of appeals, and the second one being, once that standard is determined, that the actual business of applying the standard. I'd like to begin by talking about the reasons why I would recommend the D.C. Circuit standard, which does permit fee shifting in cases of bad faith underlying conduct at the primary level, at the sort of operative fact level. The first and the most important reason, in my judgment, is the Equal Access to Justice Act. We are here applying a statute enacted by Congress with the intent and for the purpose of deterring improper agency conduct at the operative fact level, and we know this, first of all, from the words of the statute itself, passed in 1980, subsection C of 2412, which contemplates not only a judgment in cases of bad faith, but actually contemplates that the judgment would be paid not out of the general judgment fund, but would be paid by the agency itself, and the reason for that is so that the agency would be accountable to Congress, and would be deterred from engaging in improprieties such as bad faith. And if, indeed, the Sixth Circuit standard were the correct one, and the agency and the agency were to be paid at the litigation phase, then subsection C would make no sense. Why would Congress say, if the Department of Justice engages in bad faith, or the litigation counsel engages in bad faith, we're going to have the agency pay the cost as a deterrent? In addition, in 1980, when Congress passed the Equal Access to Justice Act, the law was uniform at that time, that bad faith could include pre-litigation conduct, conduct at the operative fact level. That was the Vaughn case. Vaughn had been cited with approval in a great number of Supreme Court cases, five or six Supreme Court cases. It had been applied by the regional circuits in a number of cases. A great number of cases, not only administrative cases, but beyond the administrative jurisdiction. And the trial judge here said that the Vaughn was distinguishable because it was an administrative case. But certainly, by 1980, when Congress passed the Equal Access to Justice Act, it was very well established that Vaughn would be applied outside the administrative jurisdiction. And the court, the Supreme Court, in three cases, described Vaughn as describing an inherent federal power, not an administrative power. But you have to concede that Vaughn is, the facts of Vaughn are rather unusual. I think that's true. I think that the inherent power to shift fees is reserved for extreme cases. I don't think there's much question that this is a very unusual case as well. But these are all somewhat fact-intensive, and the facts in Vaughn, the circumstances addressed in Vaughn, are quite unusual. And for that reason, it seems to me entirely appropriate to look at Vaughn not as a fundamental precept, but as a fairly narrow rule in a narrow set of circumstances. Well, I don't think that the facts of Vaughn can be layered onto the facts of this case in the way that one might say the case is on all fours. But I think that Vaughn establishes a principle, which is that the courts have the power to look at the underlying conduct. And here, Judge Gruening said, I don't have that power. I can't look at the underlying conduct and make a judgment about whether the agency acted in bad faith. And I think that if we look at cases around the country that have applied the bad faith test to the government action, we do see facts that are similar to this. And so Vaughn is instructive for the power of the court. And there are other cases that are instructive on the question of whether this activity constitutes bad faith. Why isn't Chambers the most instructive? I mean, here in Chambers, the Supreme Court revisited this issue and made some fairly broad pronouncements that seemed to address directly the situation at hand. In Chambers, there is a dissent in Chambers that addresses the question before us, which is, does the court have power to look at the operative conduct? And four of the five justices then on the court said that the court does not have such power. But the majority said we are reserving that decision. They said that on the footnote. We're not addressing this question. And in Chambers itself, the conduct involved activity that happened before the litigation as well as conduct that happened in the litigation. And so Chambers leaves open the very question that we're here confronting. And it's clear, for example, in the D.C. Circuit, the cases following Chambers have continued to apply the standard that I'm arguing for, which is that you do have the power to look at that underlying conduct. What do you make of the three-part test that Schimann uses, or the three different forms of activity, the underlying conduct, the recalcitrance, I guess, to choose a word that I don't think they actually use, with respect to the compensation for the underlying conduct, and then litigation and bad faith? They say that categories two and three are compensable, but not category one. That is the exact taxonomy of Schimann. And I find it, that is the taxonomy that they use. And the Fifth Circuit seems to have embraced that as well. The Fifth Circuit has embraced it. And there may be some other circuits, at least some panels of other circuits that have embraced it. I think there are also panels that have embraced the D.C. Circuit test, which is a two-part test, where they say litigation conduct and pre-litigation conduct. And I think that the taxonomy that the Sixth Circuit uses is not a useful one, because I think the distinction between phases one and two is not a useful distinction. And I think a hypothetical about our case might be instructive in that regard. As the members of the Court who were on the panel on the merits may recall, when we talked about the merits of this case, Judge Michel, the Chief Judge, asked about the agency conduct. And I said that I thought the agency conduct was in bad faith, and that the Court had the right to do that and hold the United States liable for that bad faith conduct. In the merits opinion, this Court did not do that. The Court said, we are looking at the covenant of good faith and fair dealing, and it is, we're not, we didn't, the Court did not make a sort of normative judgment that anybody had engaged in deception or malice or anything like that. The Court simply said that Congress, by passing a statute, and the President by signing it, snatched the fruits of the contract away from the government's counterpart. And therefore, under the Sixth Circuit taxonomy, we are within phases one, we're in phases two and three for most of the conduct that I'm complaining about. Sentex very early on communicated to the government that the course of conduct they were engaged in was in bad faith. Threatened to bring a lawsuit. The government understood that. Government agents wrote that down. And so from 1989 forward, we were in sort of phase two of the Sixth Circuit taxonomy. Well, to, I don't want to cut you off, but you're suggesting that the, I think you said the Sixth Circuit test you thought was not very useful. I mean, you're suggesting that it just is rather a flabby sort of, the middle category really doesn't have much integrity other than the way you characterize it in a particular case. Is that the problem? Well, I don't know what you're getting at here, Senator, but in our case, as it comes to the court, most of the conduct I'm complaining of is in phase two. But if the court had ruled that indeed the agencies had acted in bad faith and that triggered liability, that very same conduct would have been in phase one. And so why it's categorized in phase one versus phase two, it seems to me, is almost by chance. Well, I suppose there might be kinds of cases, I can see the problem in this case. I wonder, there might be certain kinds of cases in which phases, I forget, I think one in Shemin was bad faith in litigation and two was the immediate pre-case. I think they did it in the first one. I think they did, right. But I can see how, for example, if you had a Federal Tort Claims Act case and you had an injury that was caused by terrible conduct, but then the administrative claim was made, which is a requirement in all FDCA cases. And in the administrative claim, one of two things would happen. Either there would be a reasonable determination that as a matter of law, there was non-liability, in which case you would say, well, that's not bad faith. It was terrible conduct, but the administrative denial and then ultimately the legal position taken in court would be perfectly all right. That would be one category. You could also have a category in which suppose the agency said, we're not going to allow any of these administrative claims, let them sue us. In which case you could say that that pre-litigation conduct, denial of any access to a resolution pre-litigation would be in bad faith. There it would seem that the Sixth Circuit's test actually would have some bite. There could be circumstances in which it does. There are many circumstances in which it doesn't. Not only Your Honor's hypothetical, but you can think of Vaughn itself, where the misconduct was refusing to indemnify. Or this case where the misconduct was refusing to abide by one's good faith and fair dealing obligations. And so I think that the cleaner taxonomy is the one that D.C. Circuit uses. I also think it's the better policy for the reasons that it is a deterrent to improper conduct. And that was the intent of Congress. That's what the legislative history says. That is the reasoning that Judge Frensley used in the Gerstle case in which he said it's a deterrent and it doesn't violate the American rule. I guess my question, I can't stray far from that though, is that it was Congress and the legislature which ultimately passed the legislation which constituted the breach. And it seems to me that it would be difficult anytime the government loses with your standard, it would be difficult if the government litigates and loses. I'm not sure where you draw the line as you'd always be requesting attorney's fees in your scenario. So that's really two questions. One is, I don't know why the agency's conduct pre-breach has anything to do with this case. And the second, I don't know how the government can defend itself against attorney's fees claims if your standard applies, which is whenever you litigate and lose, you're basically in bad faith. Well, let me take them in the order that Your Honor asked them. The agency conduct here gave rise to the breach. The breach itself, I agree, was the passage of legislation by Congress signing by the President. But the breach would not have taken place had it not been for the deceptive conduct at the agency level. And this was conduct in which agency employees, the very people who only a few months earlier had worked a deal with Sentex and demanded and received consideration from Sentex for these tax benefits, then went and said, we're going to come up with a plan to lobby Congress, get Congress to change the law, and behind the scenes, we're going to write the legislation for them, lobby, and do all these things to promote it. Congress is just not independent. It's just a pliable, I wish the judiciary had as much luck. I'm not saying that Congress wasn't a willing partner, but I'm saying that in the context of the case, the bad faith is, one can make a judgment here about whether the agencies acted in bad faith. Did they engage in deceptive conduct? Did they have a malicious intent? Did they do things that, just like when we look in the patent cases, we have fraud on the patent office, or we have willful infringement. These are things that in the underlying context can give rise to fee shifting. I think that answers your Honor's second question, which is, we're not talking about every case. We're talking about a very high standard here, which is a substantive standard. Bad faith requires some moral culpability, and it requires culpability with clear and convincing evidence. I'm not arguing for a standard that is going to be applicable in every breach of contract case, or even in every breach of good faith case, but only in those cases where the plaintiff can meet a standard of showing moral culpability. Your Honor, in responding to your questions, I went over my time. Well, I'm going to restore your rebuttal time, so if that was what you were going to ask, your request is granted. Thank you, Your Honor. All right. Let's see, Mr. Huffman, you also, I think, have reserved three minutes. I have, Your Honor. Very good. I would like to address what we believe to have been the critical error below, which was, assuming that the Shimmel-Sanchez test applies, the conclusion by the Court, it's a matter of law, that the conduct that we are alleging constituted the bad faith justifying it. Let me just interrupt you for a second. Sure. I don't know whether you need to have any of your associates with you, but if you would like, then I'm sure Mr. Yelowitz would be happy to. All right. All right. Very well. We'll make him fine, Mr. Horowitz. All right. Very well. Come back. Right. Be patient. Not patient. Yeah. Let me just announce, just for the purposes of our recording, that this is number 06-5108, First Heights Bank, against the United States Bank. Thank you, Judge. Thank you, Your Honor. Very well. Go ahead. May I please report? No. All right. We're in train. The conclusion by the trial court that the conduct that we are alleging is the bad faith justifying P-shifting is the same conduct that was alleged for Pound to be the breach of the implied covenant. And I think that that was an error. And it's very important, picking up on what Mr. Yelowitz said, that what we are arguing as the bad faith here is a very discreet set of facts, which are misrepresentations, misleading statements, and incomplete and inaccurate statements made by two agencies and the contractor of one of those agencies, Mr. Susswein, in his report in 1990, which was incorporated in the RTC's report to Congress. And that, we assert, is the bad faith. That also violated statutory obligations. The government, in its brief on pages 8 and 34, twice says that the government agencies have a statutory obligation to respond to Congress's request for information with full and accurate information. And they assert on page 8 that that is what the agencies did here, and that because that's what they did here, they say, they cannot be found to be in bad faith. I would agree with them that if the agencies of the people in 1990 and 1991, the Treasury and the RTC, had made full and accurate statements to Congress, that there would be no basis for bad faith. There would still be a basis for a breach of the implied covenant, perhaps, because a breach of the implied covenant, as explained by this coordinate syntax, does not require deceptive behavior or malice or any of the other kinds of things that Mr. Yalowitz has referred to. Well, I suppose, to carry that point to its logical conclusion, or what I think is its logical conclusion, that even if the Guarini Amendment had been passed over the cries of their contractual obligations were being undermined, the case as it came to us, not this case, but the original case on the merits, would be exactly the same. Yes, it would. In fact, there wouldn't even have to be cries of anguish, I don't think. I think the agency people could have submitted a report that said the truth, which is, there is this deduction. It was the basis of the transaction. We all knew that. However, the benefits of that are very expensive, and either things have changed fiscally, or Congress, you need to help us. You need to get rid of the deduction. That may have breached the implied covenant with faith and fair dealing, either on the part of the agencies or with the contracting parties, or Congress, if it enacted the legislation, because it's the United States. But that wouldn't be bad faith. It would be honest. But the agencies, for whatever reasons, and it's not too hard to fathom, I think felt that they couldn't say that, because it might not work. I mean, after all, they'd be telling Congress, yeah, we made a deal, but we need you to break it. So what did they do? They said, there is no deduction. You need to clarify that. That will avoid litigation. The Treasury said, there's no deduction. We're prepared to litigate this. At the same time, the same Treasury official is telling his superior in private, if we litigate this, we'll lose in taxpayer and on the tax side. If we litigate these things. I guess it was a little more qualified than that, right? Something like a substantial risk of taxpayer success. I guess that's sort of code language for we lose. I think so. And the RTC report, of course, the degree of deception, the degree of insincerity is much greater on the RTC side, I will concede. There's no indication that Mr. Gratz, Professor Gratz, who is the author of that report and the author of the memo to his superior, was personally involved prior to that in saying exactly the opposite thing to Congress, to his agency, to others. But I don't think, and I don't think the trial court is under any illusions about the lack of sincerity and the misrepresentations. Indeed, the trial court found in the syntax opinion, which is the basis on fee shifting, which is the basis for ours, that the parties were aware of the fact of the state of the contract, and Mr. Susswine was a very critical part of that understanding. And then two years later comes the statement, there is no deduction, and Congress needs to clarify. Because to say the truth, there is a deduction and Congress needs to terminate it retroactively for these deals, even though we used it to get these deals, would have been politically difficult. But I do think it's important to understand that that is different from the conduct which the trial court itself found was the basis for its determination that the implied covenant had been breached by the Greeney legislation, or even the allegation against the agencies. That is what the court found termed bait and switch. It was the behavior of using a fruit or a form of consideration to entice someone into entering into a deal with you, and then you turn on that, and you lobby Congress to appropriate the fruit of that contract for the United States. That was the breach of the implied covenant. There is a long history of the implied covenant of appropriating the fruits of the contract for oneself. That has nothing to do with being deceptive in reports to Congress. That's a totally different issue. Now, Judge Robinson, I think, rightly raised the issue. Well, but if Congress is the one who breached the contract, what difference does it make if the agencies made misleading, inaccurate, untrue statements to Congress? Well, I think it makes a difference because there is quite a bit of evidence in the record that Congress was reacting to what the RTSD and the Treasury were asking for. So I don't think one can just simply discount the contributing nature of the agency conduct to the ultimate breach. But more importantly, under the D.C. test, and probably even under the Sixth Circuit test, if they had faced anything like these facts, which are unusual, the failure of the agency officials to abide by that kind of a statutory obligation to be full and open with Congress. We believe Lawrence, at least the trial court, re-examining that and seeing whether that bad faith was close enough a contributing factor to justify his plea, which he never did. He found, as Mr. Gallo said, that he didn't have the authority to look at that conduct. And our principle argument is, even if he was right and that Schimann is the appropriate standard, which we don't believe it is, he still should have seen that that conduct we were asserting was not the underlying conduct that gave rise to the allegations and finding of the breach of the implied covenant, but was a different conduct that had played a role and was part of the reason we were forced into litigation. I think the ultimate question would be, would Congress, would we have had to litigate this case if the agencies had been honest? I don't know if that could ever be answered for sure, but I don't think you would necessarily want that question to go unexamined when it involves such behavior on the part of the Let me ask you a question that bothers me about the breadth of the D.C. Circuit's test, as I understand it. Suppose you have underlying conduct by an agency that is, all would agree is outlandish conduct, but as to which the agency lawyers and then ultimately the Department of Justice ultimately, whether in pre-lawsuit or in the lawsuit, take the position that there's qualified immunity with respect to that conduct, and that's a perfectly plausible defense. They maintain that defense through an expensive litigation that goes all the way up to the Supreme Court, at which point the Supreme Court holds for the first time that qualified immunity does not apply, and therefore the plaintiff wins. Is he shifting in that case? Probably not, because under the D.C. Circuit, it's a plain statute. If I recall it, it's a refusal to conform or perform a plain statutory duty. But the initial statutory duty of the agency was clearly breached. That is to say, the duty of the agency not to intentionally seek to harm the plaintiff. That's the substantive conduct from which the lawsuit flows. Now, after that, the Department of Justice looks at it and says, the agency has really acted badly, but you know what? We have a qualified immunity defense, which is perfectly plausible. We have to run with it. We represent the taxpayers. We don't give away money where there isn't a legal obligation to do so. And so everything that's done after the initial outlandish conduct, breach of the agency's In that setting, do you shift fees under the D.C. Circuit's test and your test here? And if not, what's the difference between that case and this case? OK. On the first issue, I don't want to try and split hairs about what the D.C. Circuit meant when it said obligation, as to whether that encompassed defenses. I don't know how the D.C. This all may turn on split hair, so if hairs need to be split, split away. Usually I'm happy to do that. That example troubles me with respect to how far we would be going if we adopt the D.C. Circuit's test. All right. I don't know how the D.C. Circuit would address that situation, which, of course, was not before the hospital case. And I don't know, really, the best way that that would be addressed because the Justice Department really there is saying, I guess I'm lost as to, somebody had a clear obligation but not the defendant? No, no. The defendant, as in the agency, does something, which is clearly a violation of legal duties owed to the plaintiff. But it is, because of, in my example, qualified immunity, not actionable. It's parable, but it's not actionable. I don't think that the, you could say then that the agencies, and I may be mixing the test, the agencies failure to do that precipitated the lawsuit, or made the lawsuit inevitable, if there was a serious question about whether it was actionable. For example, maybe if you took it to the foreign affairs area, maybe where something egregious is done, if it were done here, maybe to a U.S. citizen would be egregious if it's done somewhere else. There are all kinds of questions about whether it's actionable. But let me bring it to the facts of this case because I don't think here there's any, unless Your Honor is suggesting that because the agencies were submitting reports to Congress, there might be a similarity in terms of immunity? No, no. I was simply trying to tease out, maybe the hypothetical has long since lost its utility, but I was just trying to tease out the distinction between the underlying conduct, and then everything after the underlying conduct is reasonable. Mr. Yadlis made a very good point, and it is applicable in our case too, which is the chronology in this case was that the deals were done in late 1988, and in 1989, with FIREA, Congress took a brief look at these deals and decided, as the chairman put it in the committee, a deal's a deal. Although they ended the tax benefits for deals going forward, they did not touch the past deals, which they understood had been negotiated on the basis of this deduction. There then proceeded a series of agency reports and interaction between the people involved in the deal and others, including Mr. Yadlis's client and my client, in which we made it clear that we were entitled to access to this deduction, that that was the whole point of the deal, and that it would be a breach of contract, unfair and everything else, to take it away, the deal having been done, and we having given our consideration in taking over these assets. The actions of the agency, the reports to Congress, were all taken with that claim, if you will, in mind. It wasn't a formal claim, because it would have been difficult to assert one, but it was arguably into the second category under Shimon and Sanchez. And so I do think that the underlying conduct, obviously, for me, is chosen as the end of the underlying conduct, 1993, when this falls in the same time period as the underlying misleading reports to Congress were not the basis for the claim of the breach of the implied covenant, and therefore were not part of the underlying. Thank you, Mr. Hoffman. We will restore your three minutes as well. Thank you very much. Mr. Austin, now you will combine your time in number 5105 and number 5108, if you need it. Thank you, Your Honor. May it please the Court, the trial court's judgment denying Sen. Texas' claim for attorney fees should be affirmed. The trial court did not abuse its discretion because it did not rely upon an erroneous view of the law or clearly erroneous assessment of the evidence. The trial court correctly concluded that both Sen. Texas and First Heights were not entitled to recover attorney fees for alleged backstreet conduct that occurred prior to litigation and that formed the underlying substantive basis for their claims of breach of contract. Awarding Sen. Texas and First Heights attorney fees based upon bad faith conduct that occurred prior to litigation and that underlie their substantive claims of breach of contract are inconsistent with the purposes of the bad faith exception to the American rule. Does the government embrace the Shimon test? Yes, we do, Your Honor. We embrace a test that basically says that you look to the purposes of the bad faith exception to the American rule. The American rule is that you want to allow access to the courts and the bad faith exception to that is when you want to vindicate judicial authority. You do not vindicate judicial authority when you base a bad faith award on underlying pre-litigation conduct that was a substantive claim. What you are doing is punishing the original wrong. What then do you make of the second category of Shimon? I think I understand the first and the third. I am struggling to understand the exact parameters of the second. Well, I share Your Honor's struggle in that. But you endorse the three-part test? Not so much the three-part test, but basically what we believe to be the underlying view of Shimon, of Sanchez, which is that you do not look at pre-litigation conduct because you are punishing, if you do, you are punishing the underlying wrong. But under both tests, under both Sanchez and Shimon, we are told there are certain circumstances in which you do look at pre-litigation conduct. And what I am trying to see is the extent to which the government endorses that exception to the no looking at pre-litigation conduct. I understand that, Your Honor. We do have the same confusion the court does. I think what the trial court did here was try to resolve a problem that you see throughout some of the cases. You see it in Vaughn. You see it in Chambers, certainly. You see it in Hall v. Cole. And you see it in Sanchez. And what that is, is the nomenclature. There is a footnote in the second circuit decision that Kerry truly is in there. But the problem, I think there is agreement that you do not look at pre-litigation conduct and that you do look at post-litigation conduct. The problem is, where do you draw that line? And that's what the trial court was struggling with here. So what the trial court says here, if there is a formal presentation of a claim, and the reaction to that, well, that's the type of pre-litigation conduct you can look at, as long as you consider it pre-litigation conduct. Arguably, that's post-litigation conduct, because you're looking at it. And I think that's the part of the Shinning Test that the trial court was also struggling with. Is that really pre-litigation conduct, or is that post-litigation conduct? Schuman has a description of Vaughan, in which Schuman purports to distinguish Vaughan, on the ground in part at least, that this was really not so much the primary conduct, so much as it was the denial of relief which was sought in a non-judicial proceeding, i.e., this person asked for relief and was denied it. That's right. Do you endorse that distinction of Vaughan? We do to some extent. We think there's a better distinction of Vaughan. That it's just an admiralty case, and that's the end of it. Well, it's more than an admiralty case, because it deals specifically with attorneys being awarded not so much as punitive damages, but as compensatory damages. And that's the distinction that the Supreme Court mentioned in the Fleishman and Stilling case, and that the Tenth Circuit mentioned in the Trowel Ridge case. And I would also point to Your Honor's question concerning Chambers. We believe that Chambers, although it doesn't specifically go into Vaughan, really, it really constitutes a complete rejection of Vaughan. Because what happened in the Chambers case is, the four judges who dissented clearly and explicitly said, we believe that the Supreme Court erred because the district court based its decision upon pre-litigation conduct. That can't be done. You're not allowed to base a decision from the SAC on pre-litigation conduct. So clearly, the four dissenters are clearly under the view that you can't look at it at all. The majority, if it wasn't Brace and Vaughan who thought anyone had any validity, would have said, well, it doesn't matter. It could be pre-litigation conduct. It could be post-litigation conduct. But that is not what the majority in the Chambers case did. The majority in the Chambers case did is simply said, no dissent. You are wrong. And you are wrong because we did not endorse pre-litigation conduct. It explicitly states what the breach here is, is post-litigation conduct. It's the conduct boring. The litigation is what we're punishing. Now, Mr. Gallant is correct when he said that there's a footnote in the Chambers case in which the court said, we're not directly addressing the question of whether you consider the underlying breach of conduct. But that is, in my view anyway, and it simply is stated by the court that that would be dictum because we don't need to reach that question. All we need to do is reach the question that we don't believe this is pre-litigation conduct. And this goes back to our earlier point. So Chambers leaves the question open, hence doesn't tell us anything other than what four ninths of the Supreme Court would have done with this case. I actually think Chambers goes further than that, Your Honor, because I think if you look at the version. But the footnote really does say, does it not, that we're not deciding the question of the extent to which or the possibility of considering pre-litigation conduct. It certainly does that. But my view is it's only because the court didn't need to reach the question. I think if you look elsewhere, in fact, one circuit court, I think again it's the Troward case in the 10th Circuit, specifically looked at language in Chambers and said if you look at the language in Chambers, you can't base it on the underlying breach, but you base it on the conduct during litigation. And it breaks that language and said, even though that footnote was there, it certainly appears to us as if the court in Chambers is saying you can't look at pre-litigation conduct. And. You should finish your thought and then I do have. And I think that if the court simply didn't have to reach the question, it didn't. But what is clear from that is that's a rejection of Vaughan. Because if Vaughan was the law, as the plaintiff's contended is, the Supreme Court could have easily said, look, in Vaughan we said you could look at pre-litigation conduct. So the dissent is wrong in saying that you can't look at pre-litigation conduct. We don't think this is pre-litigation conduct, but it really doesn't matter because either way it's bad. So we think that in this circuit, in the Amstead Industries case, quotes the language of Chambers in which the court focuses upon defrauding the temples of justice or defying the temples of justice. There's a clear focus upon the true purpose of the death date exception. And that is to look at the litigation process. Are you accusing the litigation process? I'm sorry. In reading all of the circuit's decisions on this issue, it occurred to me that most of the circuits have simply held that you can't base fee shifting solely on pre-litigation conduct. It occurs to me from hearing the description of the conduct that is deemed to be bad faith that it is solely pre-litigation. In fact, it's kind of before even the conduct that led to the underlying claim because the If, in fact, the standard is it can't be solely pre-litigation, but you can look at it, but it can't be solely, then is that a way to respond to the arguments? Or are we talking about other litigation? That's a confusion I have and a question I should have asked the plaintiff's counsel. Well, the solely language is confusion because, and I think I'd like to direct your honor to the language in Hall v. Cole, which was offered as a Supreme Court case from 1973, which has often been cited as a basis for that you can perhaps consider this. And the Hall v. Cole language is completely taken out of context. What the court said in Hall v. Cole is bad faith may be found not only in the action that led to the lawsuit, but also in the conduct of the litigation. Well, the Shiven case does a very thorough analysis of the Hall v. Cole case and makes it very clear that the Hall v. Cole case isn't even a good faith or bad faith case. It's simply the common fund exception, another exception to the American rule. And what happened there is the defendant came in and said, look, the common benefit exceptions based upon equitable considerations, and the equitable considerations here are that we engaged in good faith throughout. And the court said, no, no, no, that's not true. You engaged in good faith. You engaged in bad faith not only in the action that led to the lawsuit, but also in the conduct of the litigation. So it was merely commenting on the conduct that occurred in that case and its relevance to the common fund exception. So are you saying that the right standard is you do not look at pre-litigation conduct at all? Well, I think... As opposed to one of... I think that's right. I think the trial court hit it very close here, and the trial court basically here looked at the cases and came to the conclusion that you really apply a two-prong test. We're not that comfortable with the first prong because we do believe it's a little bit difficult to apply. The first prong basically that the trial court said was, let's look at whether it's pre-litigation conduct in response to a claim that was made, a formal claim that was made, and that was based, of course, on the Schindler case, and more so the Sanchez case in the Fifth Circuit. And the court said, well, here there was no formal claim, pre-litigation claim made, so that's the end of the inquiry. And the plaintiffs came back and said, well, that's not fair. It shouldn't make any difference because we basically made a formal claim in the underlying conduct because we said, Congress, if you take this action, we're going to claim breach. And the trial court said, well, you've just stepped upon the concerns of Justice Scalia and his dissent in Chambers because what Justice Scalia said is you have to have these formal lines. Otherwise, all you're doing is having substantive fee shifting. You're simply creating a statute which says one of the remedies for breach of contract is you get term fees if you engage in bad pay. Well, there's been a substantive provision that says that. And also, I'm going to go back to a follow-up question. In the Roadway Express case, which is the 1980 Supreme Court decision, the Supreme Court quoted this language from Paul. And this is discussed by the non-circuit in the association of plaintiff's case. And the Roadway Express court, very interestingly, construed this language from Paul v. Paul where it says, bad faith may be found not only in the action that led to the lawsuit, not to be referring to the underlying action, but instead to be referring specifically to the decision to bring a lawsuit or the decision to maintain a defense, which is without merit. So it's not even clear that the Halsey-Cole case, at least as both those courts construed it, Roadway Express, the Supreme Court case, and the non-circuit, are saying that has nothing to do at all with underlying conduct. So there's a lot of confusion about this. And I think that the problem is, and I think your writer hit on it too in your questions, is that you have to look at the underlying conduct on occasion in evaluating whether or not the post-litigation conduct is meritorious. Because how do you say, your honor drafted it, and your honor was part of the extensive decision in sentence. How do you look at the government's post-litigation conduct and say it was without merit unless you look at the complexities of what happened below? You necessarily have to look into those facts a little bit in order to understand whether the defense is meritorious. And there could very well be instances where the conduct was simply outrageous below. And yet it was defended as if it had a statute of limitations defense or where it failed to state a claim or numerous defenses. Let me ask a follow-up question to Judge Robinson's question. Because given that there is an apparent, if not a square conflict, among the circuits, there's at least strong tension among the various circuit courts on this. This is a case that could potentially find its way to the Supreme Court either way. So we have to be very careful that we understand the full parameters of these tests. So I really want to make sure I understand exactly what the government's position is with respect to that second category here. Because the argument that's being made by your adversaries is that Shemin allows recovery even if a broad application of the fee-shifting doctrine is not applicable. Now, I inflicted my hypothetical on Mr. Huffman. So in fairness, I'll inflict it on you. Do you say, does the government say with respect to the Federal Tort Claims Act hypothetical, you recall that one, that the agency says, let's suppose, at the administrative claim level, the agency, the postal service in this case, says, we're not going to accept any of these claims. These people can just sue us, and a certain number of them will just give up. So to heck with them. And the agency has, let's assume it, is bad faith failure to entertain these claims at the administrative stage. At which point, the person has to file suit. The person files suit, and the Department of Justice conducts the defense in perfect good faith and loses. Fees are no fees in that case. What's the department's position? Make sure I understand the hypothetical. So you're basically saying the administrative claim analysis was in bad faith? Yes. But not the litigation. Once the case made it to court, then the litigation was in complete good faith. Everything that was done from the complaint on was in good faith. But it's demonstrable and stipulated that it was bad faith at the administrative claim level. Well, Your Honor has hit right upon the small problem that we have with the trial court's decision. In other words, under the trial court's decision, that could be considered under the first problem, because it is. It's a small problem for you, but it's a larger problem for me. I really experience what the government's position is with respect to this. I understand that our position would be that there would be no bad faith in that case. No, no. So you're really asking us, if I understand it, to take not Shemin, not American Hospital, but a third position in which we would be out there alone, I think. I don't know of any other court that has gone beyond Shemin and said under no circumstances, even if you have engaged in conduct that enforces the person to go to court to vindicate their claims, that there is no right to fees. Is that your position? That's true. That's true. I would disagree with Your Honor that you'd be out there alone. And let me just give Your Honor some quotes, for example. Kelly V. Golden from the 8th Circuit. The power to award fees, they're calling it a fake exception, is exercisable only with respect to conduct occurring during the litigation, not conduct that gave rise to the cause of action. Association of flight attendants. But that doesn't, as I understand it, that doesn't walk away from Category 2 of Shemin. I think that's true, Your Honor. So you're asking us. The cause of action. I think the question Your Honor is asking is where it has nothing to do with the underlying cause of action, but the bad faith is only there. And I think that really is the gray area. We would agree with that. But you want us to paint that gray area black. We believe that that's what the dissent was getting at in the And let me explain why. I think Judge Brugink, in his decision below, really hits upon this. We're just taking it a step further than he does. Judge Brugink made it clear in this case that, and this is, by the way, what the Shemin Court was focusing upon. When you look at the substantive claim aspect, Judge Brugink's second comment, as long as the claim is part of that underlying substantive claim, that's the end of the inquiry. You're asking a gray area that's not part of the substantive claim. And what Judge Brugink said is, if you look at the plaintiff's claim here, they're saying it doesn't matter whether or not there was a formal claim. And what Judge Brugink says, you have to have a, you have to have some type of fine, clear line. There has to be a formal claim. Because otherwise, you have now gone so far as to eliminate the American rule. You have gone so far as to run into substantive fee shifting, which is exactly what the dissent was in Chambers' case. And our position differs from Judge Brugink's only in that we feel you go into that area of substantive fee shifting even without the formal litigation claim, the pre-litigation claim. Once you go beyond anything pre-litigation, you have now ventured into substantive fee shifting. And I want to get back to Mr. Gallagher's original comment about Egypt. Egypt, we believe, not only does not lend support to the plaintiffs, it lends support to us. And Egypt, of course, I'm sure the court is familiar with the difference between Section 2412D and Section 2412B. Section 2412D says that if you're under a certain net worth level, then you are entitled to maternity fees if you prevail and the government's position is not substantially justified. And the dissent text in their brief makes much of the legislative history from 1985 where it is, and we agree with them on this, pretty clear that for purposes of Section 2412D, you look at the underlying conduct as part of the analysis as to whether the government was substantially justified. It explicitly says in the same legislative history that they're talking about in the House Report that you cannot consider that legislative history for purposes of Section 2412B. But how about C2? C2, I take it, applies both to B and to D. Well, in fact, I think it even more so applies specifically to D. I think C cross-references to D. Right. But the plaintiffs are completely wrong there. I guess that's right. It's specifically on D. Cross-references to D. The plaintiffs are completely wrong there, Your Honor, because, first of all, it is 1980, that part they're running. What they're wrong about is that Section C has nothing to do with All Section C talks about is if the agency who engages in the bad faith conduct, that agency is the one who is supposed to pay the fees. Right. But typically, not universally, but typically it's the Department of Justice that takes over a case at the point at which the action is filed. Your Honor, here's the first problem with that argument. The first problem is that it's not always the Department of Justice. There are many agencies, and I believe the syntax in their brief cite cases where the Federal Deposit Insurance Corporation was hit with fees for their litigation conduct. So the assumption that it only has to do with the Department of Justice is completely wrong. Yes, we litigate for the government a lot, and certainly this court sees this all the time. But there are plenty of cases going on for other agencies so that the inference that it can only be the Department of Justice is wrong. The second leap of logic in that argument is that, well, if there is bad faith by the Department of Justice, what agency? We're going to get hit with the fees. So to make any connection between Steve, too, that they're somehow talking about pre-litigation conduct. It's just a completely unwarranted leap of logic. It has nothing to do with it. The only reference in the statute, in the legislative history of EGIP is in the 1985 amendments, which had strictly to do with substantial fees, which had strictly to do with the government and Congress making a decision there that they wanted to do basically themselves an official fee by looking at it. Not true for the bad faith exceptions. Congress wanted to do that. Congress could very easily have said, you know what we're saying about pre-litigation conduct being proper consideration? Well, let's make it applicable to 24-12-2. They said exactly the opposite. They didn't want it to be an exception. That's why we think the EGIP legislative history, the EGIP statute supports us. Not only does it help them, but actually supports our interpretation. The other point I'd like to address also is the concept here that the first case argument brought up, that there is a difference between the breach here, which I agree with. The breach here was Congress. The breach was not what the agency's conduct.  Number one is that the allegations below were both, by both of these plaintiffs, the allegations were there was a breach by Congress in enacting the Green New Legislation, and there was a breach by the agencies, whether it be the Department of Treasury or whether it be the RTC, in the conduct that they engaged in. So the fact that the court only found one when the two were The court explained, it said we didn't reach the second question because there were other defenses that we had to reach and didn't need them because the Congress is acting. But to say that they're separate and somehow not linked is just wrong. It's part of the substantive claims. Maybe not the breach found by the court, but they were both breaches. The other connection which Mr. Huffman ignores is that there's two other things that he ignores. First of all, the standard that the plaintiffs embrace is the D.C. Circuit standard, and we agree that under the D.C. Circuit standard, you can look at litigation conduct. We think it's wrong, and we think that the fact that the American Hospital case itself doesn't even deal with pre-mitigation conduct and strictly any post-mitigation conduct. But regardless of that, the victim's service says you can look at pre-mitigation conduct for purposes of bad faith, but the standard that they apply there wouldn't get the plaintiffs home here anyway based upon their allegations. The standard in the American Hospital is that bad faith in conduct giving rise to a lawsuit may be found where a party confronted with a clear statutory or judicially imposed duty towards another is so recalcitrant in performing that duty that the injured party is forced to undertake otherwise unnecessary litigation to vindicate plain labor rights. There's two important points there. Sentence alleges that the obligation that was breached here was a contractual duty. And they're right. That was another contractual duty that was formally breached here. Well, the American Hospital standard says it has to be a statutory or judicially imposed duty. So even under the American Hospital standard, these allegations wouldn't qualify. Now, First Type comes back and says, oh, well, there is a statutory or judicially imposed duty because the government says that the agencies have a duty to respond to Congress when Congress asks for information. Well, that's true, but it's not a duty to send text. It's not a duty to First Types. It's a duty to Congress. And it can't be based upon a duty to Congress. It has to be a duty to them. There wasn't a duty to them. Also, the standard was misstated, although we do believe the agencies have a duty to comply to their best ability. The full and complete is like saying somebody has to get 100 on a text. You can always say they could have said something else. That's not the standard. It has to be a good faith effort. And it was a good faith effort. Well, you're into an area now, it seems to me, in which Judge Brugink's decision does not rest, if I read it correctly. You are.  We couldn't decide the case on our own, could we, without sending it back to Judge Brugink. These are finding-based kinds of considerations, it seems to me. Well, I think the court could reach the question that these allegations wouldn't even go to the American Hospital standard. I think that would be true. I think that it's clear that the allegations are based upon under the standard that that case would be met. I think this court could reach that question. The other thing I'd like to point out in this connection is that, and I think Your Honor raised the question to your plaintiff's counsel in this regard, is there has to be a causal connection between this conduct that is alleged to be the day of faith duty and some injury to the plaintiff. And the causal connection would have to be that this lobbying, so-called lobbying, we don't believe it's lobbying, so-called lobbying led to the enactment of the legislation. If it didn't lead to the enactment of the legislation, that's the end of the inquiry. Now, plaintiff's counsel denied that. Why do we know it's true? Look at the American Hospital standard. The American Hospital standard said the duty was breached, so the craftsmen were castigated in performing that duty that the injured party is forced to undertake certain actions during the lawsuit. Well, there would be no injury. There would be no injury if Congress hadn't passed the legislation. So even under the American Hospital test, there has to be a causal link, and, therefore, to separate out their allegations of pre-litigation conduct on the agencies and to Congress would be improper. To make something clear on the response to your question, Judge Bryson, that is I agree with the court concerning the absence of finding that they had faked conduct on the government pre-litigation. I agree that doesn't need to be, if the court went there, would need to have that. Or finding no background. I mean, Judge Brugge just didn't find it necessary to address that. He's right, and I would agree that it would be inappropriate for this to be decided, but I do think the question of whether, even if all their allegations were true, it would meet the American Hospital standard is something the court could address. But I think it's clear that the causation, the duty, it just doesn't meet it. And that's the only case which sets out any standard for pre-litigation conduct being a possible basis for liability, for fake fake liability. And finally, Your Honor, the argument I'd also like to raise that we did not prevail on below is that we believe that the fact that we paid the judgment in this case would be enough reason to certainly come out of the plane for lack of jurisdiction under the language of the statute in that step. Outlined in our brief, but it's based upon 28 U.S.C. Section 2517B, it says the payment of the judgment, and of interest thereon, shall be a full discharge to the United States of all claims and demands arising out of the matters involved in the case before controversy, unless the judgment is designated a partial judgment, in which event only the matters described therein shall be discharged. This was not designated as a partial judgment. We made the payment in the case. Their allegations are premised upon the underlying conduct. We believe that the payment was foreclosed by, I'm sorry, that their claim was foreclosed by the payment that we made, and we went ahead and we told them we were going to take this position. Nonetheless, they insisted upon paying it. We believe, under the language of that statutory provision, that that forecloses their claim. Thank you. Very well, thank you, Mr. Austin. Now, Mr. Yalowitz, you have three minutes. Thank you, Your Honor. I'd like to begin by getting a chance to talk about the postal service hypothetical that everybody's been talking about. Because I think that it's useful in sort of defining the difference between the D.C. Circuit standard, the Shimon standard, and the standard that the government is now arguing for. If the postal service engages in bad faith primary conduct, you know, potentially what? They run you down in the street with a postal truck. Right, and then whip you. Right. And then everything after that is done in good faith. Under the D.C. Circuit standard, it's very clear under the D.C. Circuit cases, like the Siegel case, and I would point to the Siegel case and the Copeland case, and some of the cases cited in those cases, that the D.C. Circuit would say the court has power to shift fees based on its traditional inherent equity powers. That's the D.C. Circuit standard. The Sixth Circuit would say in that phase two period, which is the administrative level, that bad faith is also compensable. And now the government is arguing that both phases, I guess, three and two under the Sixth Circuit test, which are the diverse penalized court, are not compensable. You cannot look at those. You must only look at phase one. And they're arguing that not based on any circuit that has adopted it. They're arguing it based on the inference they draw from a dissent in the Chambers case and on the theory that Chambers inherently or subsilential overturned Vaughan. And I think they would agree if Vaughan is good law, their standard can't apply. And I would suspect everybody would agree it's not to this court to say we think Vaughan is overruled. This court would apply Vaughan. And if we are applying Vaughan under the Schiemann test, and we're looking at phases one and two, then we need a remand to Judge Ruggi because his test was phase one only. He never looked at the phase two conduct. He said, I'm not going to look at the phase two conduct. I'm only going to look at the Department of Justice conduct. And I agree that they were frivolous in some of their arguments. I agree I sanctioned them hundreds of thousands of dollars for promised conduct, but I can't say that everything they did in the defense of the litigation was in bad faith. I'm not sure that he went quite that far, and maybe you can help me. I interpreted what he was saying is that in this case there isn't a Schiemann phase two. I think he did say that. I agree that that's what he said. And I would say two things about that. One is, of course there was because Sentex wrote and warned the agencies that if they persisted in their course of conduct, they would be sued and that it would be bad faith. It wasn't an administrative claim in the way we were talking about the Postal Service, but of course there was a phase two. There's always a period in which people anticipate litigation, but it hasn't yet arisen. And we know people can't start shredding documents and doing things that would enhance their ability to win a case that they anticipate just because the complaint hasn't been filed. And the other thing he said, the other reason there's not a phase two, or the other reason it doesn't make sense to adopt Schiemann, is because in this case there's not a clean sort of break between phases three, two, and one. Phases three and two melded together to a significant degree, and that's why the cleaner, easier to apply D.C. Circuit standards would provide better guidance. Thank you. Thank you, Mr. Miller. Very well, Mr. Hoffman, three minutes. Thank you, Your Honor. I agree with my colleague, and possibly even the government, that a remand would be appropriate here under whatever standard, which of the two standards the court were to adopt, or even I would or some third. If it's the American Hospital standard, I think it would be necessary because the court, the trial court, has not addressed the key issues, notwithstanding what my friend at the Department of Justice said. First of all, I never said there didn't have to be a causative link between the bad fake conduct and the unnecessary lawsuit. I think that the bad analysis is explicit in the American Hospital text. I believe I said and explained how that bad fake conduct contributed to the lawsuit and to the breach. But that is also an issue that the trial court does not examine because he felt that it was outside of his jurisdiction. So I do think that that's necessary. And the Department of Justice counsel said that the agencies comply with the statute to make full and complete reports to Congress so long as they act in good faith. That presents the very question. We are saying they did not act in good faith when they made their representations to Congress, and that's an issue the trial court has not addressed. If it's the Shemin test, I think Mr. Yalowitz...